## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

Case No:

CARLY WILLS,                              **Hon.**

*Plaintiff,*

v.

JUSTIN SCHILTZ,

*Defendant.*

---

Jennifer D. Larson (P83441)

Jesse R. Stec (P82131)
*Attorney for Plaintiff*
JOHN R. FOLEY, P.C.
18572 W. Outer Drive
Dearborn, MI 48128
Telephone:  (313) 274-7377
Emails:    jdlarson@jrfpc.net

---

## NATURE OF THE ACTION

1.     This is an action for relief from conversion and other torts including fraud perpetrated by Defendant Justin Schiltz in connection with the sale of property he owned as joint tenant with Plaintiff, Carly Wills.

2.     The amount in controversy is over $75,000.00.

3.     Plaintiff Carly Wills seeks compensatory damages, punitive damages, and reasonable attorneys' fees and costs as remedies for Defendant Justin Schiltz's breach of contract, fraud, conversion, and other torts.

## THE PARTIES

4.     Carly Wills, an individual, is a resident of Dearborn, Michigan.

5.      Justin Schiltz, an individual, is a resident of Idaho, exact whereabouts unknown.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. §1332.

7.      Venue is proper in this Court pursuant to 28 USC § 1391(b)(2) and, in the alternative, 28 USC § 1391(b)(3).

## FACTUAL ALLEGATIONS

8.      The parties previously resided together in California.

9.      The parties had two children together.

10.     On or around May 3, 2013, the parties bought a house together at purchased 975 Logan Creek Rd, Boulder Creek, CA 95006 (the "Property").

11.     The funds for the home were initially provided by Schiltz's grandfather.

12.     The parties repaid these funds in full.

13.     The deed for the Property shows that the parties owned it as joint tenants. See **Exhibit 1 to Plaintiff's Affidavit**, attached as Exhibit A to the Complaint (June 16, 2021 amended title company report).

14.     On or about August 15, 2020, Wills returned with the children to her home state of Michigan.

15.     Shortly thereafter, Wills decided to stay in Michigan rather than return to California.

16.     On or about May 26, 2021, the parties received an offer for the Property.

17.     Schiltz told Wills that they would need to open a joint bank account to hold the sale proceeds.

18.     Schiltz knew that the parties did not need to open a joint bank account to hold the sale proceeds.

19.     Schiltz expected Wills to rely on his statement so that she would give

him access to the account where her share of the proceeds would be deposited.

20.     Schiltz never intended to share the proceeds of the sale of the Property with Wills.

21.     Schiltz also told Wills that she would be entitled to receive $72,000 of the proceeds.

22.     The expected proceeds from the sale of the home would be approximately $500,000 to $600,000.

23.     Schiltz told Wills that his share of the proceeds would also be approximately $72,000 after he paid outstanding costs for selling the home.

24.     Wills relied on Schiltz's statements about the fairness of the division of the proceeds.

25.     Wills relied on Schiltz's statements about the joint account and her share of the proceeds.

26.     Accordingly, the parties opened a joint account at Chase Bank for the express purpose of receiving funds from the sale of the Property. See Plaintiff's Affidavit **Exhibit 2** (July 7, 2021 text message from Schiltz to Wills re proceeds).

27.     Schiltz claimed that the parties would not have to pay taxes on the money deposited into the Chase account. *Id.*

28.     Schiltz jokingly warned Wills, "Please don't run off with all the money. Lol." *Id.*

29.     A closing statement dated July 7, 2021, showed proceeds of $556,506.07 due to seller. Plaintiff's Affidavit **Exhibit 3** (July 7, 2021 Closing Statement to Seller).

30.     A revised closing statement showed that the proceeds would be paid out in two separate ways: 1) "Portion of proceeds to Carly Wills&Justin Schiltz Joint Account" in the amount of $250,000; and 2) "Due To Seller" in the amount of $308,551.01. Plaintiff's Affidavit **Exhibit 4** (July 8, 2021 Revised Closing

Statement to Seller).

31.     On or about July 9, 2021, the parties closed on the sale of the Property.

32.     Upon closing, $250,000 was deposited into the Chase account.

33.     Shortly after the funds were deposited in the Chase account, defendant withdrew the entire $250,000 without plaintiff's knowledge or consent.

34.     Schiltz has not given Wills any of the proceeds of the sale of the Property.

35.     Wills resided in and remained in Michigan during the events leading up to and following the sale of the Property.

36.     Schiltz has refused to disclose his location to Wills.

37.     Numerous times over the course of their relationship, Schiltz told Wills that he would prefer to "live off the grid."

38.     In June, Schiltz picked up the minor children from their home in Dearborn, Michigan for the summer.

39.     The parties had agreed that he would return the children August 27, 2021.

40.     After absconding with Wills's share of the proceeds of the Property, Schiltz disappeared with the children.

41.     Although Schiltz had taken the children from Michigan to New York, where his parents live, Schiltz then departed with the children to parts unknown and refused to tell Wills where they were.

42.     Wills later learned that Schiltz had likely taken the children to Maine, then to California, then to Idaho.

43.     Schiltz has returned to Michigan since September, 2021, to return the parties' children to Wills.

44.     Schiltz plans to return to Michigan to exercise parenting time with the parties' children.

45.     Neither party resides in California.

46.     Schiltz knowingly and in bad faith breeched his agreement with Wills to share the proceeds of sale of the Property.

47.     Schiltz knowingly and in bad faith caused Wills to rely on his representations regarding the division and distribution of proceeds from the sale of the Property.

48.     Wills did, in fact, rely on Schiltz's representations, including specifically his statements about the Chase account.

49.     Wills was directly harmed by her reliance on Schiltz's statements when Schiltz immediately withdrew all funds from the Chase account and left Wills without any of the proceeds to which she was entitled.

50.     Wills has suffered direct and indirect damages by not having access to her share of the proceeds of the Property.

51.     Wills is likely to prevail on the merits of the case.

52.     Schiltz would not suffer undue harm were he to place the proceeds from the Property into an escrow account pending the outcome of the instant case.

53.     Given Schiltz's proclivity for "going off the grid" and disappearing with the minor children, there is a significant risk of harm that he would hide or spend all the proceeds of the Property if they are not escrowed.

54.     If no injunctive relief is ordered, the potential damage to Wills is total, which is far greater than the potential harm to Schiltz if such injunctive relief is ordered, which is no more than some minor inconvenience.

55.     It is in the public interest to preserve the rights of individuals to the benefits of their bargains and to the equity in property they earn through being joint tenants.

56.     No notice to Schiltz should be required for injunctive relief because he has already absconded with all the proceeds from the Property.

## COUNT I: BREACH OF CONTRACT

57.     The facts set forth in ¶¶ 1-56 are incorporated by reference as though fully set forth herein.

58.     Wills and Schiltz entered into an agreement whereby they would sell the Property and Wills would receive the sum of $72,000 from the sale.

59.     Schiltz breached the contract by absconding with the entire proceeds from the sale without providing any to Wills.

60.     Wills was damaged by Schiltz's breach of the contract.

61.     WHEREFORE, Wills respectfully requests that this Honorable Court enter a judgment against Schiltz in an amount not less than the Damages, including an award to Wills for the costs and fees, including attorneys costs and fees, which she has incurred in the prosecution of this Complaint, and grant such further relief as the Court may deem appropriate.

## COUNT II – INTENTIONAL MISREPRESENTATION

62.     The facts set forth in ¶¶ 1-56 are incorporated by reference as though fully set forth herein.

63.     Schiltz represented to Wills, without limitation, that it was true that Wills would receive the sum of $72,000 from the sale of the Property.

64.     Schiltz's representation was false when he made it.

65.     Schiltz knew that the representation was false when he made it or, alternatively, it was made recklessly and without regard for the truth.

66.     Schiltz intended that Wills rely on the representation.

67.     Wills reasonably relied on the Schiltz's representation.

68.     Wills was harmed and Wills's reliance on Schiltz's representation was a substantial factor in causing her harm.

69.     WHEREFORE, Wills respectfully requests that this Honorable Court enter a judgment against Schiltz in an amount not less than the Damages, including

an award to Wills for the costs and fees, including attorneys costs and fees, which she has incurred in the prosecution of this Complaint, and grant such further relief as the Court may deem appropriate.

### COUNT III – NEGLIGENT MISREPRESENTATION

70.     The facts set forth in ¶¶ 1-56 are incorporated by reference as though fully set forth herein.

71.     Schiltz represented to Wills, without limitation, that it was true that Wills would receive the sum of $72,000 from the sale of the Property.

72.     Schiltz's representation was not true.

73.     Although Schiltz may have honestly believed the representation was true, Schiltz had no reasonable grounds for believing the representation was true when he made it.

74.     Schiltz intended that Wills rely on this representation.

75.     Wills reasonably relied on Schiltz's representation.

76.     Wills was harmed and Wills's reliance on Schiltz's representation was a substantial factor in causing her harm.

77.     WHEREFORE, Wills respectfully requests that this Honorable Court enter a judgment against Schiltz in an amount not less than the Damages, including an award to Wills for the costs and fees, including attorneys costs and fees, which she has incurred in the prosecution of this Complaint, and grant such further relief as the Court may deem appropriate.

### COUNT IV - CONCEALMENT

78.     The facts set forth in ¶¶ 1-56 are incorporated by reference as though fully set forth herein.

79.     Schiltz prevented Wills from discovering certain facts including, without limitation, that he intended to retain 100% of the proceeds from the sale of the Property without providing any funds to Wills.

80.    Wills did not know of the concealed facts.

81.    Schiltz intended to deceive Wills by concealing the facts.

82.    Wills would have behaved differently had Schiltz disclosed these facts to Wills.

83.    Wills was harmed and Schiltz's concealment was a substantial factor in causing Wills's harm.

84.    WHEREFORE, Wills respectfully requests that this Honorable Court enter a judgment against Schiltz in an amount not less than the Damages, including an award to Wills for the costs and fees, including attorneys costs and fees, which she has incurred in the prosecution of this Complaint, and grant such further relief as the Court may deem appropriate.

## COUNT V – FALSE PROMISE

85.    The facts set forth in ¶¶ 1-56 are incorporated by reference as though fully set forth herein.

86.    Wills either owned, possessed, or had a right to possess half of the funds from the sale of the Property.

87.    Schiltz substantially interfered with Wills's property by knowingly or intentionally taking the property, preventing Wills from having access to the property, or refusing to return the property to Wills after Wills demanded its return.

88.    Wills did not consent and was harmed by Schiltz's retention of the property.

89.    Schiltz's conduct was a substantial factor in causing Wills's harm.

90.    WHEREFORE, Wills respectfully requests that this Honorable Court enter a judgment against Schiltz in an amount not less than the Damages, including an award to Wills for the costs and fees, including attorneys costs and fees, which she has incurred in the prosecution of this Complaint, and grant such further relief as the Court may deem appropriate.

## COUNT VI – VIOLATION OF PENAL CODE 496

91.     The facts set forth in ¶¶ 1-56 are incorporated by reference as though fully set forth herein.

92.     Schiltz received Property that was stolen, or obtained in a manner that constitutes theft or extortion, and knew when he received the Property that it was stolen or obtained in a matter that constitutes theft or extortion.

93.     Schiltz, alternatively, concealed property from Wills that he know was stolen or obtained in a manner that constitutes theft or extortion.

94.     Wills is entitled to treble damages, costs of suit, and reasonable attorney fees due to Schiltz's actions as described herein.

95.     WHEREFORE, Wills respectfully requests that this Honorable Court enter a judgment against Schiltz in an amount not less than the Damages, including treble damages and an award to Wills for the costs and fees, including attorneys costs and fees, which she has incurred in the prosecution of this Complaint, and grant such further relief as the Court may deem appropriate.

## COUNT VII – UNJUST ENRICHMENT

96.     The facts set forth in ¶¶ 1-56 are incorporated by reference as though fully set forth herein.

97.     Schiltz received 100% of the proceeds from the sale of the Property.

98.     It would be unjust for Schiltz to retain 100% of the proceeds from the sale of the Property at the expense of Wills.

99.     WHEREFORE, Wills respectfully requests that this Honorable Court enter a judgment against Schiltz in an amount not less than the Damages, including treble damages and an award to Wills for the costs and fees, including attorneys costs and fees, which she has incurred in the prosecution of this Complaint, and grant such further relief as the Court may deem appropriate.

## COUNT VIII – INJUNCTIVE RELIEF

100.   The facts set forth in ¶¶ 1-55 are incorporated by reference as though fully set forth herein.

101.   Pursuant to FRCP 65, the Court may issue a temporary restraining order without notice to the defendant if the following requirements are met:

(A) Specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B)   The movant's attorney certified in writing any efforts made to give notice and the reasons why it should not be required.

102.   Plaintiff is requesting that the Court immediately issue a temporary retraining order compelling Defendant to place the funds from the sale of the Property into an escrow account until an ultimate determination by this Court as to the allocation of the same.

103.   As described above, Defendant desires to live off the grid as much as possible and goes months at a time without providing any information about his whereabouts. Accordingly, there is a substantial risk that Defendant will hide the funds from this Court.

104.   WHEREFORE, Plaintiff requests that this Court enter a Temporary Restraining Order compelling Defendant to immediately transfer the funds to an escrow account and provide Plaintiff and the Court verification of the same.

WHEREFORE, Wills prays that this Honorable Court:

1.   Issue an Order requiring Defendant to identify the location of the proceeds of the Property forthwith;

2.   Issue an Order requiring Defendant to place the proceeds of the Property into an escrow account forthwith, pending the outcome of the instant

litigation;

     3.     Grant such other and further relief as this Court deems just and proper.

## **VERIFICATION**

By signing below, I swear and affirm that the above statements are true and accurate the best of my knowledge, information, and belief.

_____       _____

CARLY WILLS, Plaintiff                          Date

Dated:  November 19, 2021          Respectfully submitted by:
                                         JOHN R. FOLEY, P.C.

_____

JESSE R. STEC
Attorney for Plaintiff
18572 W. Outer Drive
Dearborn, Michigan 48128
(313) 274-7377
Jesse@jrfpc.net
P82131

---

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action and claims to which they have a right to a jury trial.

Dated:  November 19, 2021

Respectfully submitted by:
JOHN R. FOLEY, P.C.

JESSE R. STEC
Attorney for Plaintiff
18572 W. Outer Drive
Dearborn, Michigan 48128
(313) 274-7377
Jesse@jrfpc.net
P82131

# Exhibit

# A

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

Case No:

CARLY WILLS,                              **Hon.**

       *Plaintiff,*

  v.

JUSTIN SCHILTZ,

       *Defendant.*

---

Jennifer D. Larson (P83441)
Jesse R. Stec (P82131)
*Attorney for Plaintiff*
JOHN R. FOLEY, P.C.
18572 W. Outer Drive
Dearborn, MI 48128
Telephone:  (313) 274-7377
Emails:   jdlarson@jrfpc.net

---

STATE OF MICHIGAN )
                 ) ss
COUNTY OF WAYNE  )

## AFFIDAVIT OF PLAINTIFF, CARLY WILLS

I, Carly Wills, being first duly sworn, depose and say:

1.    I am a party in this case.

2.    I previously resided in California with Defendant Justin Schiltz ("Schiltz").

3.    I have two children with Schiltz.

4.      On or around May 3, 2013, Shiltz and I bought a house together at 975 Logan Creek Rd., Boulder Creek, CA 95006 (the "Property").

5.      The funds for the home were initially provided by Schiltz's grandfather.

6.      Schiltz and I repaid these funds in full.

7.      The deed for the Property shows that we owned it as joint tenants. See **Exhibit 1** (June 16, 2021 amended title company report).

8.      On or about August 15, 2020, I returned to Michigan with our children.

9.      Shortly thereafter, I decided to stay in Michigan instead of returning to California.

10.     On or about May 26, 2021, Schiltz and I received an offer for the Property.

11.     Schiltz told me that he and I would need to open a joint bank account to hold the sale proceeds.

12.     I believe that Schiltz knew that we did not need to open a joint bank account to hold the sale proceeds.

13.     I believe that Schiltz expected me to rely on this statement so that I would give him access to the account where my share of the proceeds would be deposited.

14.     I believe Schiltz never intended to share the proceeds of the sale of the Property with me.

15.     Schiltz also told me that I would be entitled to receive $72,000 of the proceeds.

16.     The expected proceeds from the sale of the home would be approximately $500,000 to $600,000.

17.     Schiltz told me that his share of the proceeds would also be approximately $72,000 after he paid outstanding costs for selling the home.

18.     I relied on Schiltz's statements about the fairness of the division of the proceeds.

19.     I relied on Schiltz's statements about the joint account and my share of the proceeds.

20.     Accordingly, Schiltz and I opened a joint account at Chase Bank for the express purpose of receiving funds from the sale of the Property. See **Exhibit 2** (July 7, 2021 text message from Schiltz to Wills re proceeds).

21.     Schiltz claimed that we would not have to pay taxes on the money deposited into the Chase account.

22.     Schiltz jokingly warned me, "Please don't run off with all the money.

23.     We received a closing statement dated July 7, 2021 that showed proceeds of $556,506.07 due to seller. See **Exhibit 3** (July 7, 2021 Closing Statement to Seller).

24.     A revised closing statement showed that the proceeds would be paid

out in two separate ways: 1) "Portion of proceeds to Carly Wills&Justin Schiltz Joint Account" in the amount of $250,000; and 2) "Due To Seller" in the amount of $308,551.01. See **Exhibit 4** (July 8, 2021 Revised Closing Statement to Seller).

25.     On or about July 9, 2021, Schiltz and I closed on the sale of the Property.

26.     Upon closing, $250,000 was deposited into the Chase account.

27.     Shortly after the funds were deposited in the Chase account, Schiltz withdrew the entire $250,000 without my knowledge or consent.

28.     Schiltz has not given me any of the proceeds from the sale of the Property.

29.     I resided in and remained in Michigan during the events leading up to and following the sale of the Property.

30.     Schiltz has refused to disclose his location to me.

31.     Numerous times over the course of their relationship, Schiltz told me that he would prefer to "live off the grid."

32.     In June, Schiltz picked up the minor children from their home in Dearborn, Michigan for the summer.

33.     We had agreed that he would return the children August 27, 2021.

34.     After absconding with my share of the proceeds of the Property, Schiltz disappeared with the children.

35.    Although Schiltz had taken the children from Michigan to New York, where his parents live, Schiltz then departed with the children to parts unknown and refused to tell me where they were.

36.    I later learned that Schiltz had likely taken the children to Maine, then to California, then to Idaho.

37.    Schiltz has returned to Michigan since September, 2021, to return the children to me.

38.    Schiltz plans to return to Michigan to exercise parenting time with the children.

39.    Neither Schiltz or I resides in California.

40.    I believe that Schiltz knowingly and in bad faith breeched his agreement with me to share the proceeds of sale of the Property.

41.    I believe that Schiltz knowingly and in bad faith caused Wills to rely on his representations regarding the division and distribution of proceeds from the sale of the Property.

42.    I relied on Schiltz's representations, including specifically his statements about the Chase account.

43.    I was directly harmed by my reliance on Schiltz's statements when Schiltz immediately withdrew all funds from the Chase account and left me without any of the proceeds to which I was entitled.

44.    If called to testify, I can and will testify truthfully and competently to

the foregoing facts.

Further affiant sayeth not.

By signing below, I declare, under penalty of perjury, that the above statements are
true and accurate.

_____
Carly Wills


Subscribed and sworn to before me
this 19th day of November, 2021.

_____
Heidi Kezele-Cole, Notary Public
Wayne County, Michigan
My Commission Expires:

Page **6** of **6**

Exhibit 1

**CLTA Preliminary Report Form**
(Rev. 11/06)

Order Number: 4402-6607611
Page Number: 1

**Amended 6/16/2021**

 *First American Title*

# First American Title Company
**330 Soquel Avenue**
**Santa Cruz, CA 95062**
California Department of Insurance License No. 151

| | | |
|---|---|---|
| Escrow Officer: | Brandy Kelly | |
| Phone: | (831)426-6500 | |
| Fax No.: | (866)475-0367 | |
| E-Mail: | bkelly@firstam.com | **READ & APPROVED** |
| | | |
| Title Officer: | Brandy Kelly | _____ |
| Phone: | (831)426-6500 | _____ |
| Fax No.: | (866)475-0367 | |
| E-Mail: | bkelly@firstam.com | |

E-Mail Loan Documents to:

Lenders please contact the Escrow Officer for email address for sending loan documents.

Buyer: Erica Neisler
Owner: Justin Schiltz and Carly Wills
Property: 975 Logan Creek Rd
Boulder Creek, CA 95006

## PRELIMINARY REPORT

In response to the above referenced application for a policy of title insurance, this company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said Policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Exhibit A attached. *The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.* Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit A. Copies of the policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

**CLTA Preliminary Report Form**
(Rev. 11/06)

Order Number:  4402-6607611
Page Number:  2

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

Dated as of May 21, 2021 at 7:30 A.M.

The form of Policy of title insurance contemplated by this report is:

ALTA/CLTA Homeowner's (EAGLE) Policy of Title Insurance (2013) and ALTA Ext Loan Policy 1056.06 (06-17-06) if the land described is an improved residential lot or condominium unit on which there is located a one-to-four family residence; or ALTA Standard Owner's Policy 2006 (WRE 06-17-06) and the ALTA Loan Policy 2006 (06-17-06) if the land described is an unimproved residential lot or condominium unit

A specific request should be made if another form or additional coverage is desired.

Title to said estate or interest at the date hereof is vested in:

JUSTIN SCHILTZ, AN UNMARRIED MAN AND CARLY WILLS, AN UNMARRIED WOMAN, AS JOINT TENANTS

The estate or interest in the land hereinafter described or referred to covered by this Report is:

A FEE AS TO PARCEL(S) ONE AND TWO OF TRACT ONE AND PARCEL ONE OF TRACT TWO, AN EASEMENT AS TO PARCEL(S) THREE OF TRACT ONE AND PARCEL TWO OF TRACT TWO

The Land referred to herein is described as follows:

(See attached Legal Description)

At the date hereof exceptions to coverage in addition to the printed Exceptions and Exclusions in said policy form would be as follows:

1.  General and special taxes and assessments for the fiscal year 2021-2022, a lien not yet due or payable.

2.  General and special taxes and assessments for the fiscal year 2020-2021.

| | |
|---|---|
| First Installment: | $2,524.00, AMOUNT INCLUDES PENALTIES, DELINQUENT |
| Penalty: | $0.00 |
| Second Installment: | $2,544.00, AMOUNT INCLUDES PENALTIES AND ANY COST/FEE AMOUNT, DELINQUENT |
| Penalty: | $0.00 |
| Tax Rate Area: | 090-109 |
| A. P. No.: | 089-461-41 |

Order Number: **4402-6607611**
Page Number: 4

3.   General and special taxes and assessments for the fiscal year 2020-2021.

First Installment:          $352.85, AMOUNT INCLUDES PENALTIES, DELINQUENT
Penalty:                    $0.00
Second Installment:         $372.85, AMOUNT INCLUDES PENALTIES AND ANY
                            COST/FEE AMOUNT, DELINQUENT
Penalty:                    $0.00
Tax Rate Area:              090-109
A. P. No.:                  089-461-28

4.   The lien of defaulted taxes for the fiscal year 2019-2020, and any subsequent delinquencies.
Tax Rate Area:              090-109
A. P. No.:                  089-461-28
Amount to redeem:           $776.98
Valid through:              JUNE 2021
Amount to redeem:           $785.68
Valid through:              JULY 2021
**Please contact the tax office to verify the payoff amount.**

5.   The lien of defaulted taxes for the fiscal year 2019-2020, and any subsequent delinquencies.
Tax Rate Area:              090-109
A. P. No.:                  089-461-41
Amount to redeem:           $5,401.84
Valid through:              JUNE 2021
Amount to redeem:           $5,464.72
Valid through:              JULY 2021
**Please contact the tax office to verify the payoff amount.**

6.   Assessment liens, if applicable, collected with the general and special taxes, including but not limited
to those disclosed by the reflection of the following on the tax roll:

Community Facilities District CFD NO. 2016-1 LIBRARY FACILITIES.


AFFECTS TRACT ONE

7.   The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75
of the California Revenue and Taxation Code.

8.   The Terms, Provisions and Easement(s) contained in the document entitled "RIGHT OF WAY"
recorded March 24, 1964 as BOOK 1606, PAGE 422 of Official Records.

The location of the easement cannot be determined from record information.

9.   An easement for RIGHT OF WAY FOR ROAD AND UTILITY and incidental purposes in the document
recorded February 27, 1969 as INSTRUMENT NO. 1969-0005873, BOOK 1936, PAGE 91 of Official
Records.

AFFECTS TRACT ONE

Order Number: **4402-6607611**
Page Number: 5

10.   An easement for ROAD AND UTILITY and incidental purposes in the document recorded December 05, 1969 as INSTRUMENT NO. 1969-0035076, BOOK 1991, PAGE 79 of Official Records.

      AFFECTS TRACT TWO

11.   An easement for INGRESS AND EGRESS, PUBLIC UTILITIES and incidental purposes in the document recorded June 10, 1970 as INSTRUMENT NO. 1970-0014900, BOOK 2023, PAGE 49 of Official Records.

      AFFECTS TRACT ONE

12.   An easement for INGRESS AND EGRESS, PUBLIC UTILITIES and incidental purposes in the document recorded June 10, 1970 as INSTRUMENT NO. 1970-0014901, BOOK 2023, PAGE 51 of Official Records.

13.   The terms and provisions contained in the document entitled "DECLARATION OF RESTRICTION TO MAINTAIN A STRUCTURE AS A STORAGE SHED" recorded February 27, 1984 as INSTRUMENT NO. 1984-0009119, BOOK 3684, PAGE 952 OF OFFICIAL RECORDS.

      AFFECTS TRACT ONE

14.   A deed of trust to secure an original indebtedness of $120,000.00 recorded May 14, 2019 as INSTRUMENT NO. 2019-0012671 OF OFFICIAL RECORDS.
      Dated:                        May 06, 2019
      Trustor:                      JUSTIN SCHILTZ, AN UNMARRIED MAN AND CARLY WILLS, AN UNMARRIED WOMAN, AS JOINT TENANTS
      Trustee:                      FIRST AMERICAN TITLE INSURANCE COMPANY, A NEBRASKA CORPORATION
      Beneficiary:                  KAY DONNA WINDER-ISON AND ROBERT LEE ISON TRUSTEES OF THE ISON TRUST DATED MARCH 6, 2002


   a.   If this deed of trust is to be eliminated in the policy or policies contemplated by this report/commitment, the company will require the following for review prior to the recordation of any documents or the issuance of any policy of title insurance:
        i.    Original note and deed of trust.
        ii.   Payoff demand statement signed by all present beneficiaries.
        iii.  Request for reconveyance or substitution of trustee and full reconveyance must be signed by all present beneficiaries and must be notarized by a First American approved notary.

   b.   If the payoff demand statement or the request for reconveyance is to be signed by a servicer, we will also require a full copy of the loan servicing agreement executed by all present beneficiaries.

   c.   If any of the beneficial interest is presently held by trustees under a trust agreement, we will require a certification pursuant to Section 18100.5 of the California Probate Code in a form satisfactory to the Company.

15.   Any easements and/or servitudes affecting easement parcel(s) THREE OF TRACT ONE AND PARCEL TWO OF TRACT TWO herein described.

16.   Rights of the public in and to that portion of the Land lying within any Road, Street, Alley or Highway.

Order Number: **4402-6607611**
Page Number: 6

17.    Water rights, claims or title to water, whether or not shown by the Public Records.

18.    Any claim that any portion of the land is below the ordinary high water mark where it was located prior to any artificial or avulsive changes in the location of the shoreline or riverbank.

19.    Any rights, interests, or easements in favor of the public, which exist or are claimed to exist over any portion of said land covered by water, including a public right of access to the water.

20.    Any claim that any portion of the land is or was formerly tidelands or submerged lands.

21.    The new lender, **if any**, for this transaction may be a Non-Institutional Lender. If so, the Company will require the Deed of Trust to be signed before a First American approved notary.

Order Number: **4402-6607611**
Page Number: **7**

| INFORMATIONAL NOTES |
| --- |

Note: The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than the certain dollar amount set forth in any applicable arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. If you desire to review the terms of the policy, including any arbitration clause that may be included, contact the office that issued this Commitment or Report to obtain a sample of the policy jacket for the policy that is to be issued in connection with your transaction.

1.  This report is preparatory to the issuance of an ALTA Loan Policy. We have no knowledge of any fact which would preclude the issuance of the policy with CLTA endorsement forms 100 and 116 and if applicable, 115 and 116.2 attached.

    When issued, the CLTA endorsement form 116 or 116.2, if applicable will reference a(n) Single Family Residence  known as 975 LOGAN CREEK RD, BOULDER CREEK, CA.

    AFFECTS TRACT ONE

2.  The property covered by this report is vacant land.

    AFFECTS TRACT TWO

3.  According to the public records, there has been no conveyance of the land within a period of twenty-four months prior to the date of this report, except as follows:

    None

    NOTE to proposed insured lender only: No Private transfer fee covenant, as defined in Federal Housing Finance Agency Final Rule 12 CFR Part 1228, that was created and first appears in the Public Records on or after February 8, 2011, encumbers the Title except as follows: None

The map attached, if any, may or may not be a survey of the land depicted hereon. First American expressly disclaims any liability for loss or damage which may result from reliance on this map except to the extent coverage for such loss or damage is expressly provided by the terms and provisions of the title insurance policy, if any, to which this map is attached.

## LEGAL DESCRIPTION

Real property in the unincorporated area of the County of Santa Cruz, State of California, described as follows:

TRACT ONE:

PARCEL ONE:

A PORTION OF LOT 3 IN SECTION 5, T. 9 S., R. 2W., M.D. B. & M.
BEGINNING AT THE SOUTHEASTERN CORNER OF THE LANDS DESCRIBED IN THE DEED TO E. VICTORIA PLYMIRE RECORDED JUNE 10, 1970, INSTRUMENT 14901, BOOK 2023, PAGE 51 OF OFFICIAL RECORDS OF SANTA CRUZ COUNTY; THENCE FROM SAID POINT OF BEGINNING ALONG THE SOUTHERN BOUNDARY LINE OF SAID LOT 3, WEST 185.00 FEET TO A POINT ON SAID BOUNDARY LINE; THENCE LEAVING SAID BOUNDARY LINE NORTH 775 FEET, A LITTLE MORE OR LESS, TO A POINT BEING THE CENTERLINE OF AN EXISTING ROAD, COMMONLY KNOWN AS LOGAN VALLEY ROAD; THENCE FROM SAID POINT AND ALONG THE CENTERLINE OF SAID ROAD EASTERLY 200 FEET, A LITTLE MORE OR LESS, TO THE POINT OF BEGINNING.

PARCEL TWO:

A PORTION OF LOT 3 IN SECTION 5 OF T. 9 S., R. 2 W., M.D. B. & M.
BEGINNING AT THE N. E. CORNER OF SAID LOT 3, BEING THE QUARTER SECTION CORNER OF SAID SECTION 5; THENCE ALONG THE NORTHERN BOUNDARY LINE OF SAID LOT 3, WEST 410.00 FEET; THENCE LEAVING SAID BOUNDARY, SOUTH 360 FEET, A LITTLE MORE OR LESS, TO A POINT BEING THE CENTERLINE OF THE EXISTING ROAD COMMONLY KNOWN AS LOGAN VALLEY ROAD, THENCE FROM SAID POINT AND ALONG CENTERLINE OF SAID ROAD EASTERLY 450 FEET, A LITTLE MORE OR LESS, TO A POINT BEING THE EASTERN BOUNDARY LINE OF SAID LOT 3, THENCE FROM SAID POINT AND LEAVING CENTERLINE OF SAID ROAD AND ALONG THE EASTERN BOUNDARY LINE OF SAID LOT 3 NORTH 400 FEET, A LITTLE MORE OR LESS TO THE POINT OF BEGINNING.

PARCEL THREE:

AN EASEMENT 60 FEET IN WIDTH FOR INGRESS AND EGRESS AND PUBLIC UTILITIES, THE CENTERLINE OF WHICH IS DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WESTERN BOUNDARY LINE OF LOT 4 OF SECTION 5 IN TOWNSHIP 9 SOUTH, RANGE 2 WEST, MOUNT DIABLO MERIDIAN, WITH THE CENTERLINE OF AN EXISTING ROAD KNOWN AS LOGAN CREEK ROAD FROM WHICH THE NORTHWEST CORNER OF SAID LOT 4 BEARS ALONG SAID BOUNDARY LINE OF SAID SECTION, NORTH 3°15' WEST 675.10 FEET DISTANT; THENCE FROM SAID PLACE OF BEGINNING, NORTH 86°00' EAST 90.56 FEET; SOUTH 63°00' EAST 83.70 FEET; NORTH 71°00' EAST 311.17 FEET; SOUTH 58°00' EAST 107.52 FEET; NORTH 77°30' EAST 173.76 FEET; SOUTH 69°00' EAST 314.65 FEET; NORTH 78°00' EAST 160.06 FEET; SOUTH 37°00' EAST 110.15 FEET; NORTH 67°00' EAST 205.50 FEET; SOUTH 74°00' EAST 189.44 FEET; SOUTH 45°00' EAST 147.18 FEET; SOUTH 76°00' EAST 119.58 FEET; NORTH 61°00' EAST 320.42 FEET; NORTH 66°00' EAST 199.76 FEET; NORTH 83°00' EAST 157.21 FEET; NORTH 74°00' EAST 200.27 FEET; NORTH 66°00' EAST 241.61 FEET; NORTH 82°00' EAST 103.99 FEET; SOUTH 57°00' EAST 154.73 FEET, AND NORTH 89°00' EAST 94.96 FEET TO THE EASTERN BOUNDARY LINE OF LOT 3 IN THE ABOVE MENTIONED SECTION 5.

TRACT TWO:

PARCEL ONE:

Order Number: **4402-6607611**
Page Number:  9

BEING A PORTION OF THE LANDS DESCRIBED IN THE DEED TO E. VICTORIA PLYMIRE, RECORDED
JUNE 10, 1970, IN VOLUME 2023 OF OFFICIAL RECORDS AT PAGE 51, SANTA CRUZ COUNTY RECORDS,
AND BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID LANDS, THENCE FROM SAID POINT OF BEGINNING
AND ALONG THE NORTH LINE OF SAID LANDS WEST 390 FEET TO THE NORTHWEST CORNER
THEREOF; THENCE ALONG THE WEST LINE OF SAID LANDS SOUTH 490 FEET, A LITTLE MORE OR LESS
TO THE CENTERLINE OF THE RIGHT OF WAY DESCRIBED IN THE DEED TO VICTORIA PLYMIRE,
THENCE EASTERLY ALONG SAID CENTERLINE 400 FEET, A LITTLE MORE OR LESS, TO A POINT FROM
WHICH THE POINT OF BEGINNING BEARS NORTH; THENCE LEAVING SAID CENTERLINE NORTH 360
FEET, A LITTLE MORE OR LESS, TO THE POINT OF BEGINNING.

PARCEL TWO:

TOGETHER WITH AN EASEMENT 60 FEET IN WIDTH FOR INGRESS AND EGRESS AND PUBLIC
UTILITIES, AND BEING MORE PARTICULARLY DESCRIBED IN THE ABOVE MENTIONED DEED TO E.
VICTORIA PLYMIRE.

   APN: 089-461-41 and 089-461-28

**READ & APPROVED**

Order Number: **4402-6607611**
Page Number: 10



Order Number:  **4402-6607611**
Page Number:  11

### *NOTICE*

Section 12413.1 of the California Insurance Code, effective January 1, 1990, requires that any title insurance company, underwritten title company, or controlled escrow company handling funds in an escrow or sub-escrow capacity, wait a specified number of days after depositing funds, before recording any documents in connection with the transaction or disbursing funds. This statute allows for funds deposited by wire transfer to be disbursed the same day as deposit. In the case of cashier's checks or certified checks, funds may be disbursed the next day after deposit. In order to avoid unnecessary delays of three to seven days, or more, please use wire transfer, cashier's checks, or certified checks whenever possible.

Order Number: **4402-6607611**
Page Number: 12

**EXHIBIT A**
**LIST OF PRINTED EXCEPTIONS AND EXCLUSIONS (BY POLICY TYPE)**

**CLTA STANDARD COVERAGE POLICY – 1990**
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public, records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6. Any lien or right to a lien for services, labor or material unless such lien is shown by the public records at Date of Policy.


**CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)**
EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;

Order Number: **4402-6607611**
Page Number: 13

    d.  improvements on the Land;
    e.  land division; and
    f.  environmental protection.
    This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2.    The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3.    The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.

4.    Risks:
    a.  that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
    b.  that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
    c.  that result in no loss to You; or
    d.  that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.    Failure to pay value for Your Title.

6.    Lack of a right:
    a.  to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b.  in streets, alleys, or waterways that touch the Land.
    This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7.    The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8.    Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

9.    Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your Insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $10,000 |
| Covered Risk 18: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 19: | 1% of Policy Amount Shown in Schedule A or $5,000 (whichever is less) | $25,000 |
| Covered Risk 21: | 1% of Policy Amount Shown in Schedule A or $2,500 (whichever is less) | $5,000 |

## 2006 ALTA LOAN POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.    (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

        (i) the occupancy, use, or enjoyment of the Land;
        (ii) the character, dimensions, or location of any improvement erected on the Land;
        (iii) the subdivision of land; or
        (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2.    Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3.    Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

Order Number: 4402-6607611
Page Number: 14

(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
(a) a fraudulent conveyance or fraudulent transfer, or
(b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

EXCEPTIONS FROM COVERAGE

[Except as provided in Schedule B - Part II,[ t[or T]his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

[PART I

[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:
1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.

PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:]

2006 ALTA OWNER'S POLICY (06-17-06)
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

(i) the occupancy, use, or enjoyment of the Land;
(ii) the character, dimensions, or location of any improvement erected on the Land;
(iii) the subdivision of land; or
(iv) environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
(b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
(a) created, suffered, assumed, or agreed to by the Insured Claimant;
(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 or 10); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
(a) a fraudulent conveyance or fraudulent transfer, or
(b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5.  Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:
[The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1.  (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency  that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.  Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by  persons in possession of the Land.
3.  Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4.  Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the Public Records at Date of Policy.
7.  [Variable exceptions such as taxes, easements, CC&R's, etc. shown here.]

### ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (07-26-10)
EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

(i) the occupancy, use, or enjoyment of the Land;
(ii) the character, dimensions, or location of any improvement erected on the Land;
(iii) the subdivision of land; or
(iv) environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations.  This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk  5, 6, 13(c), 13(d), 14 or 16.
(b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.
2.  Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3.  Defects, liens, encumbrances, adverse claims, or other matters
(a) created, suffered, assumed, or agreed to by the Insured Claimant;
(b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
(c) resulting in no loss or damage to the Insured Claimant;
(d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
(e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4.  Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5.  Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.
6.  Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the

Order Number: **4402-6607611**
Page Number: 16

Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.

8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is

    (a) a fraudulent conveyance or fraudulent transfer, or

    (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

 First American Title℠

### Privacy Notice

**Effective:** October 1, 2019

**Notice Last Updated:** January 1, 2021

This Privacy Notice describes how First American Financial Corporation and its subsidiaries and affiliates (together referred to as "First American," "we," "us," or "our") collect, use, store, and share your information. This Privacy Notice applies to information we receive from you offline only, as well as from third parties, when you interact with us and/or use and access our services and products ("Products"). For more information about our privacy practices, including our online practices, please visit https://www.firstam.com/privacy-policy/. The practices described in this Privacy Notice are subject to applicable laws in the places in which we operate.

**What Type Of Information Do We Collect About You?** We collect a variety of categories of information about you. To learn more about the categories of information we collect, please visit https://www.firstam.com/privacy-policy/.

**How Do We Collect Your Information?** We collect your information: (1) directly from you; (2) automatically when you interact with us; and (3) from third parties, including business parties and affiliates.

**How Do We Use Your Information?** We may use your information in a variety of ways, including but not limited to providing the services you have requested, fulfilling your transactions, comply with relevant laws and our policies, and handling a claim. To learn more about how we may use your information, please visit https://www.firstam.com/privacy-policy/.

**How Do We Share Your Information?** We do not sell your personal information. We only share your information, including to subsidiaries, affiliates, and to unaffiliated third parties: (1) with your consent; (2) in a business transfer; (3) to service providers; and (4) for legal process and protection. To learn more about how we share your information, please visit https://www.firstam.com/privacy-policy/.

**How Do We Store and Protect Your Information?** The security of your information is important to us. That is why we take commercially reasonable steps to make sure your information is protected. We use our best efforts to maintain commercially reasonable technical, organizational, and physical safeguards, consistent with applicable law, to protect your information.

**How Long Do We Keep Your Information?** We keep your information for as long as necessary in accordance with the purpose for which it was collected, our business needs, and our legal and regulatory obligations.

**Your Choices** We provide you the ability to exercise certain controls and choices regarding our collection, use, storage, and sharing of your information. You can learn more about your choices by visiting https://www.firstam.com/privacy-policy/.

**International Jurisdictions**: Our Products are offered in the United States of America (US), and are subject to US federal, state, and local law. If you are accessing the Products from another country, please be advised that you may be transferring your information to us in the US, and you consent to that transfer and use of your information in accordance with this Privacy Notice. You also agree to abide by the applicable laws of applicable US federal, state, and local laws concerning your use of the Products, and your agreements with us.

We may change this Privacy Notice from time to time. Any and all changes to this Privacy Notice will be reflected on this page, and where appropriate provided in person or by another electronic method. **YOUR CONTINUED USE, ACCESS, OR INTERACTION WITH OUR PRODUCTS OR YOUR CONTINUED COMMUNICATIONS WITH US AFTER THIS NOTICE HAS BEEN PROVIDED TO YOU WILL REPRESENT THAT YOU HAVE READ AND UNDERSTOOD THIS PRIVACY NOTICE.**

**Contact Us** dataprivacy@firstam.com or toll free at 1-866-718-0097.

© 2020 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE:FAF

 *First American Title*™

## For California Residents

If you are a California resident, you may have certain rights under California law, including but not limited to the California Consumer Privacy Act of 2018 ("CCPA"). All phrases used in this section shall have the same meaning as those phrases are used under California law, including the CCPA.

**Right to Know**. You have a right to request that we disclose the following information to you: (1) the categories of **personal information** we have collected about or from you; (2) the categories of sources from which the **personal information** was collected; (3) the business or commercial purpose for such collection and/or disclosure; (4) the categories of third parties with whom we have shared your **personal information**; and (5) the specific pieces of your **personal information** we have collected. To submit a verified request for this information, go to our online privacy policy at www.firstam.com/privacy-policy to submit your request or call toll-free at 1-866-718-0097. You may also designate an authorized agent to submit a request on your behalf by going to our online privacy policy at www.firstam.com/privacy-policy to submit your request or by calling toll-free at 1-866-718-0097.

**Right of Deletion**. You also have a right to request that we delete the **personal information** we have collected from and about you. This right is subject to certain exceptions available under the CCPA and other applicable law. To submit a verified request for deletion, go to our online privacy policy at www.firstam.com/privacy-policy to submit your request or call toll-free at 1-866-718-0097. You may also designate an authorized agent to submit a request on your behalf by going to our online privacy policy at www.firstam.com/privacy-policy to submit your request or by calling toll-free at 1-866-718-0097.

**Verification Process**. For either a request to know or delete, we will verify your identity before responding to your request. To verify your identity, we will generally match the identifying information provided in your request with the information we have on file about you. Depending on the sensitivity of the information requested, we may also utilize more stringent verification methods to verify your identity, including but not limited to requesting additional information from you and/or requiring you to sign a declaration under penalty of perjury.

**Notice of Sale**. We do not sell California resident information, nor have we sold California resident information in the past 12 months. We have no actual knowledge of selling the information of minors under the age of 16.

**Right of Non-Discrimination**. You have a right to exercise your rights under California law, including under the CCPA, without suffering discrimination. Accordingly, First American will not discriminate against you in any way if you choose to exercise your rights under the CCPA.

**Notice of Collection**. To learn more about the categories of **personal information** we have collected about California residents over the last 12 months, please see "What Information Do We Collect About You" in https://www.firstam.com/privacy-policy. To learn about the sources from which we have collected that information, the business and commercial purpose for its collection, and the categories of third parties with whom we have shared that information, please see "How Do We Collect Your Information", "How Do We Use Your Information", and "How Do We Share Your Information" in https://www.firstam.com/privacy-policy.

**Notice of Sale**. We have not sold the **personal information** of California residents in the past 12 months.

**Notice of Disclosure**. To learn more about the categories of **personal information** we may have disclosed about California residents in the past 12 months, please see "How Do We Use Your Information" and "How Do We Share Your Information" in https://www.firstam.com/privacy-policy.

© 2020 First American Financial Corporation and/or its affiliates. All rights reserved. NYSE:FAF

Exhibit 2

Case 2:21-cv-12715-TGB-EAS   ECF No. 1, PageID.40   Filed 11/18/21   Page 40 of 55

J

Justin New Phone ›

Wed, Jul 7, 3:26 PM

The title co is gonna call you about percentage and disbursement of funds. Wait to call them till after we talk so we both put the same thing on the instructions. We're prolly gonna have to get that notarized again

Thursday 2:46 PM

Hey so I finally got this worked out and have an appointment tomorrow morning at 10 am to open up a joint account for me and you. I'm gonna have em deposit 250k into it and we won't have to pay taxes on it. Please don't run off with all the money. Lol. Then once everything clears you can take the 72k out of that and we can close the account Can you run to a chase bank at some point tomorrow after 10 and just show your id and sign the paperwork. They said it should be quick. I'll help you with what both of us write on the disbursement instructions for the title company because mine and yours have to match identically.

iMessage

**2:02**    .  . LTE ▭

< 1    J

Justin New Phone >



☰ Complete your account checklist    >

**Account details**

Available balance ⓘ    $0.00

Present balance ⓘ    $0.00

Account number    2380

Routing number ⓘ

Interest rate    0.00%

Interest in 2021    $0.00

> I just left the bank. That's our joint account info if they need it. I'll make sure I have my phone on me if you have any questions



Friday 2:23 PM

> So basically once your on the account we can give that info to the title company. The title company is gonna put 250k into it and then Yogesh will record it and then you can do a transfer from that account to your personal account

     iMessage    

      

2:02     LTE

 

**Justin New Phone** ›

And we won't owe any taxes on it

Do you think brandy.. then Yogesh.. will complete all of this by 5? I'm wondering if I stay or go. I have to return Amy's car

That's great about the taxes

I never received any of my stimulus checks .. they owe me

Prolly not by 5 because I think brandy is gonna have to have that updated form notarized again but not positive. Marybeth mentioned a round two with the notary last time so we had the correct info

Ok

I'm waiting to be seen

Regards,
**Donna Anderson**
Senior Escrow Assistant to Brandy Kelly
First American Title
330 Soquel Avenue
Santa Cruz, CA 95062
Phone: 831-426-6500
Fax: 866-475-0367
Email: dcanderson@firstam.com
Website: http://www.firstam.com/title/ca/santa-cruz
A member of the First American Financial Corporation
family of companies | NYSE: FAF

**COVID-19 UPDATE:**
How First American is Preparing and Responding

**www.FirstAm.com/COVID-19-Update**

iMessage

2:02 ·11 LTE

< 1



Justin New Phone >

**COVID-19 UPDATE:**
How First American is Preparing and Responding

**www.FirstAm.com/COVID-19-Update**

1. **Disbursement of sale proceeds:** Per Justins instructions, $72,000.00 is to be put into a joint escrow account with both of you. Remaining balance goes to Justin. Carly- your instructions just provides us with your Chase bank account, but no further instructions. Please REPLY ALL to confirm if we are to follow Justin's instructions. If so, we will need the joint escrow account wire instructions.

**Justin**- we need from you-

1. Form 593 completed/signed

> This is incorrect info on brandys part right?

> It's $250,000 into a joint account and my percentage was 9% right ?

K

> We have to create an email that says $250,000 into our joint account and I'm 9% owner

Yes

> Can you do that? Or should I respond and you say yes we both agree?

iMessage

2:02                                                      .ıl LTE 🔋

  

Justin New Phone  ›

We both have to do it and it has to match but I feel like i remember her saying it had to be motorized. Marybeth is trying to get in touch with her now

Re: **NEED RESPONSE**975 Logan Creek/6607611

Hello Brandy,

Justin and I have agreed to put $250,000 in our joint  account. I am 9% owner. Thank you

Carly Wills

Sent from my iPhone

On Jul 9, 2021, at 2:34 PM, Marybeth McLaughlin <marybeth@roomsantacruz.com> wrote:

From Justin yesterday, he did not reply to all.

Update. I have the joint account info and percentages. Carly is going to the bank at 2:30 in Michigan to put her name on the joint account and should be good to go.
It also mentioned in this email that I need to



You respond saying this is what we have agreed to

  iMessage 

      

2:02    LTE



Justin New Phone >

$250,000 to be deposited into Carly Wills and Justin Schiltz joint account.
account number ████2380
Wire routing number █████████
And the remainder to be deposited into Justin Schiltz personal account.
Account number ████6066
Wire routing number █████████
Carly is 9% owner and Justin is 91%.

Thank you perfect I'm done

Did you get my email replying to all

To: Justin, Marybeth & 4 more... >

Thanks Justin and Carly.

Couple more things-

1. Justin- please complete/sign Form 593 and submit to escrow. I believe you kept the form with you at time of signing. You can scan and email completed form to us or fax to 866-475-0367.
2. Carly- RE Form 593- you marked no exemption apply which means a tax withholding may apply. Are you and Justin selling this home as a principal residence? Meaning, in the last 5 years, did you live in it for at least 2?

Thanks,
Brandy

iMessage



TOTAL CHECKING (...2380)

## TOTAL CHECKING (...2380)

**$0.00**

Available balance

Pay   |   Transfer   |   •••

Complete your account checklist    >

## Account details

| | |
|---|---|
| Available balance ⓘ | $0.00 |
| Present balance ⓘ | $0.00 |
| Account number | '2380 |
| Routing number ⓘ | |
| Interest rate | 0.00% |
| Interest in 2021 | $0.00 |
| Last statement date | N/A |

**Hide details** ⌃




Case 2:21-cv-12715-TGB-EAS ECF No. 1, PageID.47 Filed 11/18/21 Page 47 of 55



**Justin New Phone** >

Monday 1:28 PM

Is the money in the account?

Can you please call me

Why was it in and then taken out ?

Today is my dads birthday

Read Monday

Please don't go back on what we agreed to

Why won't you answer

Please don't do this to me

Please

You've seen my messages

Why are you doing this

Please answer Justin

I just called MaryBeth and she said that everything is good on her end

Please don't do this to me. Why I don't understand. This is hurting me

iMessage

2:03     LTE





**J**

Justin New Phone

Please don't do this to me. Why I don't understand. This is hurting me

I would like to know where the kids are please. I am very panicked at what is happening

I'm filing a police report

Monday 3:53 PM

I want the kids returned home now

Monday 5:41 PM

The kids are good and we will get this all sorted out.

Yesterday 8:03 AM

I only want the kids returned

I quit my apprenticeship because what's the point anymore. I just want the kids home.

I rather not live a life like this . I have tried my best and worked hard for what? To be treated like garbage. You lied. You took every cent. Why do you treat me like this ? I don't understand.
It's painful

    iMessage   

      

2:03 .ıll LTE 🔋



Justin New Phone ›

It's painful

Please just bring the kids back now

Where are my guns? I have asked you for them and you will not return them . I have asked you about my kids you will not respond. You took all the money in our joint account with no reason. It will be 24 hours since all of this has happened. I will make a police report. I have nothing to lose and more to gain. You are a cruel person

Do I need to report and amber alert?

The kids are good and with me as agreed. we will get this all sorted out.

Feel free to call them anytime

There in the pool and can call you back in a little while

Where are the kids?

I am devastated by all of this. You have no clue how this affects me

iMessage

Exhibit 3

| American Land Title Association | ALTA Settlement Statement - Seller |
|---|---|
| | Adopted 05-01-2015 |

File No.: 4402-6607611
Printed: 06/29/2021, 3:36 PM
Officer/Escrow Officer: Brandy Kelly/BK
Settlement Location:
330 Soquel Avenue, Santa Cruz, CA 95062

**First American Title Company**

330 Soquel Avenue • Santa Cruz, CA 95062
Phone: (831)426-6500  Fax: (866)488-0736
Estimated Settlement Statement



Property Address: 975 Logan Creek Rd, Boulder Creek, CA 95006
Buyer: Erica Neisler
Seller: Justin Schiltz; Carly Wills
Lender: Fairway Independent Mortgage Corporation
Settlement Date: 07/06/2021
Disbursement Date:

| Description | Seller Debit | Seller Credit |
|---|---|---|
| **Financial** | | |
| Sale Price | | 799,000.00 |
| | | |
| **Prorations/Adjustments** | | |
| County Taxes  07/01/21 to 07/06/21  @$320.77/semi | 10.69 | |
| County Taxes (089-461-41)  07/01/21 to 07/06/21  @$2,294.55/semi | 76.49 | |
| Seller Credit | 10,000.00 | |
| | | |
| **Title Charges & Escrow / Settlement Charges** | | |
| Eagle Owners Policy  to First American Title Company | 1,080.50 | |
| Escrow Fee - One Half  to First American Title Company | 827.50 | |
| Notary/Signing Fee  to First American Title Company | 100.00 | |
| | | |
| **Commission** | | |
| Real Estate Commission  to Room Real Estate | 27,965.00 | |
| Real Estate Commission  to Room Real Estate | 19,975.00 | |
| | | |
| **Government Recording and Transfer Charges** | | |
| Record Reconveyance  to Santa Cruz County Recorder | 44.00 | |
| County Documentary Transfer Tax | 878.90 | |
| | | |
| **Payoff(s) and Payment(s)** | | |
| Kay Donna Winder-Ison & Robert Lee Ison Trustees of the ISON Tru | | |
| Principal Balance  to Kay Donna Winder-Ison & Robert Lee Ison Trustees of the ISON Tru | 120,000.00 | |
| May Payment  to Kay Donna Winder-Ison & Robert Lee Ison Trustees of the ISON Tru | 1,000.00 | |
| June Payment  to Kay Donna Winder-Ison & Robert Lee Ison Trustees of the ISON Tru | 1,000.00 | |
| July Payment  to Kay Donna Winder-Ison & Robert Lee Ison Trustees of the ISON Tru | 1,000.00 | |
| | | |
| **Miscellaneous** | | |
| Natural Hazard and Environmental Report  to GeoDisclosure | 99.00 | |
| Propert Prep  to Side Financial Services, LLC | 42,019.30 | |

| Description | Seller | |
| --- | --- | --- |
| | Debit | Credit |
| Concierge Loan to Thousand Homes, Inc | 4,373.45 | |
| 1st Installment 2020-2021 Amount with Penalty to Santa Cruz County Tax Collector | 352.85 | |
| 2nd Installment 2020-2021 Amount with Penalty to Santa Cruz County Tax Collector | 372.85 | |
| Defaulted Tax 2019-2020 thru July to Santa Cruz County Tax Collector | 785.68 | |
| 1st Installment 2020-2021 Amount with Penalty to Santa Cruz County Tax Collector | 2,524.00 | |
| 2nd Installment 2020-2021 Amount with Penalty to Santa Cruz County Tax Collector | 2,544.00 | |
| Defaulted Tax 2019-2020 thru July to Santa Cruz County Tax Collector | 5,464.72 | |
| | | |
| Subtotals | 242,493.93 | 799,000.00 |
| Due To Seller | 556,506.07 | |
| Totals | 799,000.00 | 799,000.00 |

Escrow related fees including separate fees for overnight mail- courier or notary services that are not included as part of First American's filed escrow fee may include a markup over the direct cost to First American for such services.

Our wire instructions do not change. Our banking institution is First American Trust. If you receive an email or other communication that appears to be from us or another party involved in your transaction instructing you to wire funds to a bank other than First American Trust, you should consider it suspect and you must call our office at an independently verified phone number. Do not inquire with the sender.

Acknowledgement
We/I have carefully reviewed the Estimated ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements to be made on my account or by me in this transaction and further certify that I have received a copy of the Estimated ALTA Settlement Statement. This Estimated Settlement Statement is subject to changes, corrections or additions at the time of final computation of Escrow Settlement Statement. We/I authorize First American Title Company to cause the funds to be disbursed in accordance with the Final ALTA Settlement Statement to be provided to me/us at closing.

Seller(s):


Justin Schiltz


Carly Wills


Copyright 2015 American Land Title Association.
All rights reserved

File # 4402-6607611
Printed on 06/29/2021 at 3:36 PM

Exhibit 4

| American Land Title Association | ALTA Settlement Statement - Seller |
|---|---|
| | Adopted 05-01-2015 |

File No.: 4402-6607611
Printed: 07/09/2021, 1:42 PM
Officer/Escrow Officer: Brandy Kelly/dca
Settlement Location:
330 Soquel Avenue, Santa Cruz, CA 95062

**First American Title Company**

**330 Soquel Avenue • Santa Cruz, CA 95062**
**Phone: (831)426-6500   Fax: (866)488-0736**
**Final Settlement Statement**
**Revised After Settlement:**
**Friday Jul 9, 2021  1:42 PM**



Property Address:  975 Logan Creek Rd, Boulder Creek, CA 95006
Buyer:  Erica Neisler
Seller:  Justin Schiltz; Carly Wills
Address:  14802 Newport Avenue #15B, Tustin, CA 92780
Lender:  Fairway Independent Mortgage Corporation
Settlement Date: 07/08/2021
Disbursement Date: 07/08/2021

| | | Seller | |
|---|---|---|---|
| **Description** | | **Debit** | **Credit** |
| **Financial** | | | |
| Sale Price | | | 799,000.00 |
| | | | |
| **Prorations/Adjustments** | | | |
| County Taxes  07/01/21 to 07/08/21  @$320.77/semi | | 14.26 | |
| County Taxes (089-461-41)  07/01/21 to 07/08/21  @$2,294.55/semi | | 101.98 | |
| Seller Credit | | 10,000.00 | |
| | | | |
| **Title Charges & Escrow / Settlement Charges** | | | |
| Eagle Owners Policy split 50/50  to First American Title Company | | 1,080.50 | |
| Escrow Fee - One Half  to First American Title Company | | 827.50 | |
| | | | |
| **Commission** | | | |
| Real Estate Commission  to Room Real Estate | | 27,965.00 | |
| Real Estate Commission  to Room Real Estate | | 19,975.00 | |
| | | | |
| **Government Recording and Transfer Charges** | | | |
| Record Reconveyance  to Santa Cruz County Recorder | | 40.00 | |
| County Documentary Transfer Tax | | 878.90 | |
| | | | |
| **Payoff(s) and Payment(s)** | | | |
| Kay Donna Winder-Ison & Robert Lee Ison Trustees of the ISON Tru | | | |
| Principal Balance  to Kay Donna Winder-Ison & Robert Lee Ison Trustees of the ISON Tru | | 120,000.00 | |
| Statement/Forwarding Fee  to Kay Donna Winder-Ison & Robert Lee Ison Trustees of the ISON Tru | | 30.00 | |
| July Payment  to Kay Donna Winder-Ison & Robert Lee Ison Trustees of the ISON Tru | | 1,000.00 | |
| | | | |
| **Miscellaneous** | | | |
| Natural Hazard and Environmental Report  to GeoDisclosure | | 99.00 | |
| Propert Prep  to Side Financial Services, LLC | | 42,019.30 | |

Copyright 2015 American Land Title Association.
All rights reserved

File # 4402-6607611
Printed on 07/09/2021 at 1:42 PM

| Description | Seller | |
|---|---|---|
| | Debit | Credit |
| Concierge Loan  to Thousand Homes, Inc | 4,373.45 | |
| Portion of proceeds  to Carly Wills&Justin Schiltz Joint Account | 250,000.00 | |
| 1st Installment 2020-2021 Amount with Penalty  to Santa Cruz County Tax Collector | 352.85 | |
| 2nd Installment 2020-2021 Amount with Penalty  to Santa Cruz County Tax Collector | 372.85 | |
| Defaulted Tax 2019-2020 thru July  to Santa Cruz County Tax Collector | 785.68 | |
| 1st Installment 2020-2021 Amount with Penalty  to Santa Cruz County Tax Collector | 2,524.00 | |
| 2nd Installment 2020-2021 Amount with Penalty  to Santa Cruz County Tax Collector | 2,544.00 | |
| Defaulted Tax 2019-2020 thru July  to Santa Cruz County Tax Collector | 5,464.72 | |
| | | |
| **Subtotals** | 490,448.99 | 799,000.00 |
| Due To Seller | 308,551.01 | |
| Totals | 799,000.00 | 799,000.00 |

*Brandy Kelley*

Escrow Officer: Brandy Kelly